**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Western Watersheds Project, et al.,

    Plaintiffs,

v.

Sonny Perdue, et al.,

    Defendants.

No. CV-21-00020-TUC-SHR

**Order Re: Cross Motions for Summary Judgment**

  Pending before the Court are a Motion for Summary Judgment filed by Plaintiffs Western Watersheds Project ("Western Watersheds") and Wilderness Watch (collectively, "Plaintiffs") (Doc. 16) and a Cross Motion for Summary Judgment filed by Defendants Sonny Perdue, Erick Stemmerman, Ed Holloway, Jr., United States Forest Service, and United States Department of Agriculture (collectively "Forest Service") (Doc. 18). Plaintiffs seek declaratory relief against the Forest Service under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and allege three violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* (Doc. 1 at 19–29.) For the reasons below, the Court grants the Forest Service's Cross Motion for Summary Judgment and denies Plaintiffs' Motion for Summary Judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

  This case arises from a livestock grazing project in the Apache-Sitgreaves and Gila National Forests called the Stateline Project (the "Project"). (AR at 20921, 20924.[1])

---

[1] AR refers to the administrative record in this case.

The stated purposes for the Project are to:

> • authorize livestock grazing on the Apache-Sitgreaves and Gila National Forests in a manner that maintains or improves project area resource conditions and achieves the objectives and desired conditions described in the forest plans; and
> • provide long-term management direction on grazing through allotment management plans, including the permitted numbers and class of livestock, season of use, facilities associated with livestock grazing, allowable forage utilization levels, and associated permit clauses.

(AR at 20924.)  And, the stated needs of the Project are to:

> • meet the requirements of the Rescissions Act of 1995 (Public Law 104-19), section 504, which requires that all range allotments undergo National Environmental Policy Act analysis;
> • maintain or improve current satisfactory resource conditions and to improve those areas in unsatisfactory conditions to move toward desired conditions; and
> • incorporate management flexibility through an adaptive management strategy consistent with Forest Service policy (Forest Service Handbook 2209.13, chapter 90) to adapt management to changing resource conditions or management objectives.

(AR at 20924–25.)

The Project area involves 14 allotments of land where grazing has been ongoing for decades.  (AR at 20921; AR at 21002.)  It covers approximately 271,665 acres with 126,243 acres in Arizona and 145,422 acres in New Mexico.  (AR at 20921.)  This includes portions of special management areas, 21,531 acres of the Gila Wilderness, 58 acres of the Blue Range Wilderness, 33,495 acres of the Blue Range Primitive Area, and approximately 79,990 acres of inventoried roadless areas.  (AR at 21002.)  It also includes portions of the San Francisco River and six river stretches in New Mexico designated as Outstanding National Resource Waters.  (AR at 21003; AR at 20965.)  There are 90 cultural resource sites located in the Arizona portion of the Project area, and 261 cultural resource sites in the New Mexico portion of the Project area.  (AR at 20996–97.)

The Project area is home to numerous game species and provides habitat for several

critically imperiled species protected by the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.* (AR at 20974–75.) This includes habitat for the endangered Mexican Gray Wolf ("Mexican Wolf").[2] (AR at 20974.) According to the U.S. Fish and Wildlife Service ("FWS"), the Mexican Wolf "is the rarest and most genetically distinct subspecies of all the North American gray wolves." (AR at 12416.) Illegal shooting of Mexican Wolves constituted the "single greatest source of [Mexican] [W]olf mortality in the reintroduced population, accounting for almost half of all deaths between 1998 and June 1, 2009." (AR at 12421.) In 2015, the FWS promulgated a revised management rule for Mexican Wolves under Section 10(j) of the ESA. (AR at 12423.) This rule created three different geographic management zones—Zone 1, Zone 2, and Zone 3. (*Id.*)

> In Zone 1, Mexican [W]olves may be initially released or translocated. In Zone 2, Mexican [W]olves will be allowed to naturally disperse and occupy, and wolves may be translocated within the zone. Pups under five months of age will be released on federal land in Zone 2. In Zone 3, neither initial releases nor translocations will occur, but Mexican [W]olves will be allowed to disperse into and occupy this zone. (*Id.*)

The Project area is within a portion of Zone 1 of the Mexican Wolf Experimental Population Area.[3] (AR at 23075–76.)

"[T]he growth of the [Mexican Wolf] experimental population has been hindered by escalating adult mortalities, illegal takings, and pup mortality." (AR at 12427.) Lawful management removals of Mexicans Wolves have also hindered population growth and

---

[2]Though Mexican Wolves once numbered in the thousands, by the 1970s, Mexican Wolves "hovered on the brink of extinction." (AR at 12416.) The Mexican Wolf was first listed as an endangered subspecies in 1976. (AR at 12417.) "All Mexican [W]olves alive today originated from the seven founding wolves that by 1980 constituted the last of the subspecies." (*Id.*) In 1998, eleven Mexican Wolves were released into the wild in Arizona and New Mexico, "constituting the first reintroduction of the subspecies into the wild." (AR at 12419.)

[3]Mexican Wolf Experimental Population Area ("MWEPA") means "an area in Arizona and New Mexico including Zones 1, 2, and 3, as defined in this paragraph (k)(3), that lies south of Interstate Highway 40 to the international border with Mexico." 50 C.F.R. § 17.84(k)(3).

FWS "has recognized that permanent removals have the same practical effect on the wolf population as mortality." (*Id.*) Past removals and control measures of Mexican Wolves "have led to the loss of genetically valuable animals." (*Id.*) FWS "has repeatedly recognized that one of the chief threats to the species is loss of genetic diversity." (*Id.*) "The Mexican [W]olf, in particular, is more susceptible to population decline than other gray wolf populations because of smaller litter sizes, less genetic variation, lack of immigration from other populations, and potential low pup recruitment." (AR at 12428.)

### A. The Forest Service's Authorization of the Project

In December 2017, the Forest Service published a scoping notice for the Project. (AR at 20926; AR at 7468–69.) In January 2018, Western Watersheds submitted scoping comments on the Project. (AR at 11864–67.)

In October 2018, the Forest Service issued a Preliminary Environmental Assessment ("EA") in which it evaluated two options: a no-action grazing plan ("Alternative 1") and a proposed action for grazing ("Alternative 2"). (AR at 13586; AR at 13596.) The Forest Service announced two 30-day periods for review and comment (AR at 20926), and both Western Watersheds and Wilderness Watch submitted comments on the Preliminary EA. (AR at 14722–862.) Based on the information received, the Forest Service identified various issues and topics of concern. (AR at 20926–27.) The Forest Service subsequently clarified or modified some of the proposed actions, but concluded, "[t]he comments received did not result in the need to create additional alternatives," so it maintained the two alternatives it had in the Preliminary EA. (AR at 20927–28.)

In June 2019, the Final EA was published. (AR at 20917.) The next month, the Forest Service provided a 45-day period for the public to review and object to the Final EA and the three "draft decision notice[s] (DDN) and finding[s] of no significant impact (FONSI)." (AR at 23163; AR at 23184; AR at 23254; AR at 23002–04.) Western Watersheds and Wilderness Watch submitted formal objections again. (AR at 23072–93.) The Forest Service reviewed and responded to the objections in accordance with the

administrative review procedures found at 36 C.F.R. § 218, Subparts A and B.[4]  (AR at 23133–48.)

By January 2020, the Forest Service had issued its three final FONSIs for all the allotments implicated by the Project.  (AR at 23152–70 (Alma, Citizen, Dry Creek, Holt Gulch, Pleasanton, Potholes, and Sacaton Allotments); AR at 23172–92 (Alma Mesa, Copperas, Keller Canyon, and Lop Ear Allotments); AR at 23242–63 (Blackjack, Hickey, and Pleasant Valley Allotments).)  These FONSIs indicated the Forest Service chose and authorized Alternative 2.  (AR at 23153; AR at 23173; AR at 23243.)

Alternative 2 reauthorizes 10-year grazing permits and allotment management plans.  (AR at 11616; AR at 19794.)  Alternative 2 permits an overall number of 3,808 to 3,838 head of cattle or horses, depending on the season, for a total of 44,186 Animal Unit Months ("AUMs").[5]  (AR at 20928.)  This represents a decrease of 1,276 AUMs from the previous permitted numbers.  (*Id.*)  Alternative 2 authorizes twelve allotments to be stocked with livestock year-round (AR at 20928; AR at 23154 (six); AR at 23174 (four); AR at 23244 (two)), one allotment (Sacaton) to be used seasonally (AR at 23154), and one allotment (Pleasant Valley) to be closed from grazing altogether (AR at 20937–38).

Alternative 2 also permits several new infrastructure projects to distribute and improve livestock management.  (AR at 20933–34; AR at 7497; AR at 20968–69.)  Specifically, it authorizes the installation or construction of:  16.7 miles of new fencing, 25 water storage tanks, 51 water troughs, 46.5 miles of pipeline to transport water, 5 new

---

[4]The Council on Environmental Quality adopted new NEPA regulations that became effective September 14, 2020, and were codified as of July 1, 2021.  85 Fed. Reg. 43,304, 43,357 (July 16, 2020) (codified at 40 C.F.R. § 1500–18 (2021)).  Because the Forest Service's planning and decision in this case predate these changes, the Court applies the regulations in effect prior to those revisions.

[5]"An animal unit month is a measure of the amount of forage required by a 1,000-pound cow or its equivalent for one month based on a daily allowance of 26 pounds of dry forage per day.  It is not synonymous with animal-month or head-month, which is an expression of one month's occupancy of the range by an animal.  For calculating animal unit months and for conversion factors, a dry cow or a cow-calf pair is considered 1.0 animal unit months, a yearling is 0.7 animal unit months, a bull is 1.5 animal unit months, and a horse is 1.2 animal unit months."  (AR at 20921.)

wells, 1 new trick tank, 3 new cattleguards, 3 new solar panels, and 4 new corrals.  (AR at 20933.)

### B.  **Procedural History**

In January 2021, Plaintiffs filed a complaint against the Forest Service alleging it failed to comply with NEPA in analyzing and authorizing the Project.  (Doc. 1.)  The parties subsequently moved for summary judgment.  (Doc. 16 (Plaintiff's motion); Doc. 18 (Forest Service's motion).)  The motions have been fully briefed and the administrative record is lodged in the record.  (*See* Doc. 15 (administrative record on a flash drive).)  The Court held oral argument on August 16, 2023.  (Docs. 24, 25.)

## II.   STANDARD OF REVIEW

### A.  **Summary Judgment**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c).  Summary judgment is a particularly appropriate tool for resolving claims challenging agency actions, i.e., "deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985).  Summary judgment is appropriate in this case because the issues presented address the legality of Defendants' actions based on the administrative record and do not require resolution of factual disputes.  *See Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc) ("Because this is a record review case, [the district court] may direct that summary judgment be granted to either party based upon our review of the administrative record.").

### B.  **Administrative Procedure Act (APA)**

Because NEPA does not provide a private right of action, "judicial review of an agency action proceeds under the Administrative Procedure Act (APA)." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 491 (9th Cir. 2023); *see also* 5 U.S.C. § 701 *et. seq.*  The

APA directs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (internal citation and quotation omitted). That is, "[a]gency action should be overturned only when the agency has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The party challenging the administrative decision bears the burden of persuasion and, "even assuming the [agency] made missteps[,] the burden is on [the challenging party] to demonstrate that the [agency's] ultimate conclusions are unreasonable." *Ctr. for Cmty. Action & Env't Just. v. FAA*, 18 F.4th 592, 599 (9th Cir. 2021) (quoting *City of Olmsted Falls, Ohio v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002)).

## III.   NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)

When an agency proposes an action to address a need, the NEPA process begins and the agency must determine which level of NEPA review it will pursue: an Environmental Impact Statement ("EIS"), an Environmental Assessment ("EA"), or a categorical exclusion ("CE"). *See* 40 C.F.R. § 1501.4.

An EIS is a "detailed written statement," 40 C.F.R. § 1508.11, that is required for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Certain agency proposals normally require an EIS. *See* 40 C.F.R. § 1501.4.

Conversely, an EA is a "concise public document" that serves to "[b]riefly provide

sufficient evidence and analysis for determining whether to prepare an" EIS or a finding of no significant impact ("FONSI"). 40 C.F.R. § 1508.9(a)(1). A FONSI is a document "briefly presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.13. The FONSI "shall include the [EA] or a summary of it and shall note any other environmental documents related to it. . . . If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference." *Id.*

A CE is "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an [EA] nor an [EIS] is required." 40 C.F.R. § 1508.4.

If an EIS is not normally required for the proposed action and a CE does not apply, as is the case here, the agency must prepare an EA to see if the proposed action warrants an EIS. The EA will either help the agency confirm no EIS is necessary or help the agency prepare an EIS. 40 C.F.R. § 1508.9(a)(2)–(3). An EA need only include a "reasonably thorough discussion of the significant aspects of probable environmental consequences," *350 Montana v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022) (quoting *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172, 1194 (9th Cir. 2008)), and take a "hard look" at the "likely" effects of the proposed action, *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 916–17 (9th Cir. 2012).

## IV.   DISCUSSION

Plaintiffs argue the Forest Service violated NEPA and the APA when it authorized the Project by failing to: (1) take a "hard look" at the Project's impacts on Mexican Wolves, the Blue Range Primitive Area, and inventoried roadless areas; (2) prepare an EIS based on the context and intensity of the Project; and (3) consider a reasonable range of alternatives. (Doc. 16-1 at ii.) The Court addresses each argument below.

. . . .

A. **"Hard Look" Under NEPA**

Plaintiffs argue the Forest Service "failed to take a hard look at the direct, indirect, and cumulative" impacts of the Project on:  (1) the Mexican Wolves; (2) the Blue Range Primitive Area's wilderness values; and (3) the region's inventoried roadless areas.  (Doc. 16-1 at 1, 10.)   According to Plaintiffs, this "makes accurate assessment of the environmental consequences of the proposed action impossible" and makes the EA arbitrary and capricious.  (*Id.* at 10–11.)

NEPA requires agencies to take "a 'hard look' at the likely effects of the proposed action," including "all foreseeable direct and indirect impacts."  *Ctr. for Biological Diversity*, 695 F.3d at 916–17.[6]  Direct impacts are "caused by the action and occur at the same time and place."  40 C.F.R. § 1508.8(a).  Indirect impacts "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b).

Taking a "hard look" also requires agencies to conduct a full assessment of the project's cumulative impacts.  *Ctr. for Biological Diversity*, 695 F.3d at 916–17.  A cumulative impact "is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.  "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  *Id.*  An agency takes a "hard look" and properly considers cumulative impacts by including some "quantified or detailed information."  *Ctr. for Cmty. Action & Env't Just. v. FAA*, 61 F.4th 633, 644 (9th Cir. 2023) (quoting *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020)).  "General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided."  *Bark*, 958 F.3d at 872 (cleaned up).

_____

[6]NEPA regulations use the terms "effects" and "impacts" synonymously.  40 C.F.R. § 1508.8(b).

In other words, an agency meets its obligations and takes a "hard look" when the EA contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *350 Montana*, 50 F.4th at 1265.  The Court finds application of this standard fraught with confusion because it relies on vague murky definitions that provide little guidance to the Court and the parties impacted by the regulations.  Nonetheless, the Court applies the standard, as set forth in the case law, within the context of the APA's highly deferential standard of review.  *See N.W. Ecosystem All.*, 475 F.3d at 1140 ("[APA] standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.").

**1. Impact on Mexican Wolves**

Plaintiffs argue the EA is arbitrary and capricious because the Forest Service failed to take a "hard look" and conduct "a 'thorough' and 'detailed' review and analysis of the relevant impacts" of the Project on "Mexican [W]olves and Mexican [W]olf recovery." (Doc. 16-1 at 10–11; Doc. 21 at 1–2.)  According to Plaintiffs, the Forest Service "arbitrarily rubber-stamped" the Project simply because livestock grazing and infrastructure developments have "occurred in the region 'for more than a century.'" (Doc. 21 at 1.)  Plaintiffs make three specific arguments on this matter:  (1) the Forest Service failed to analyze how authorizing grazing could directly lead to "management removals" of Mexican Wolves in the wild—through either lethal removal or permanent relocations— because of wolf/livestock conflicts; (2) the Forest Service failed to analyze the indirect impacts of removals on the "severely genetically depressed" Mexican Wolf population; and (3) the Forest Service failed to analyze the cumulative impacts of the Project based on the authorization of grazing in "the core of the recovery zone explicitly designated for the reintroduction of Mexican [W]olves into the wild," and Mexican Wolves' "increased "susceptibil[ity] to population decline," threats of "excessive levels of illegal killing[s]," removals arising from "wolf/livestock conflicts," and "dire genetic status." (Doc. 16-1 at 11–13.)  Plaintiffs reason the cumulative impacts of the Project make the already

- 10 -

1   "extremely fragile situation for Mexican [W]olves even worse" and this may lead to no

2   Mexican Wolves in the future.  (*Id.* at 12–13.)

3       The Court finds Plaintiffs have failed to demonstrate the Forest Service's "ultimate

4   conclusions are unreasonable" regarding the minimal effects the Project will have on

5   Mexican Wolves.  *See Ctr. for Cmty. Action*, 18 F.4th at 599.  Although the Project area

6   includes habitat for the endangered Mexican Wolf, there is no designated or proposed

7   *critical* habitat for the Mexican Wolves because they are an "experimental, non-essential

8   population" (AR at 20978).  *See* 50 C.F.R. § 17.84(k) (Mexican Wolf identified as non-

9   essential experimental population for which critical habitat cannot be designated); *see also*

10  16 U.S.C. § 1539(j)(2)(C)(ii) (critical habitat not designated for non-essential,

11  experimental populations).

12      Contrary to Plaintiffs' suggestion, the Forest Service did not solely rely on the

13  Mexican Wolf's "experimental and non-essential" status to support a blanket exemption

14  that no impacts for this status should be considered.  (Doc. 21 at 2–5.)  Rather, the Forest

15  Service consulted with FWS multiple times (AR at 20977) and used that information to

16  help inform its conclusion that any impact on the Mexican Wolves from this Project would

17  be minimal.[7]

18      The Forest Service discussed Mexican Wolves in the EA and centered that

19  discussion on mitigation measures in case the Mexican Wolves "establish[ed] a territory

20  within an allotment or depredation by wolves bec[ame] an issue."[8]  (AR at 20977.)  This

21

---

22      [7]Plaintiffs argue the Forest Service could not rely on ESA consultations with FWS
23  because an agency's ESA obligations are different than NEPA obligations.  (Doc. 21 at 2–
    5.)  While the obligations are different, Plaintiff has not pointed to any meaningful
24  authority showing it is improper to consider this information in a NEPA analysis.  While it
    may be improper to *exclusively* rely on ESA consultations, it does not appear improper to
25  use that information in a NEPA analysis.  *Cf. Env't Prot. Info. Ctr. v. U.S. Forest Serv.*,
26  451 F.3d 1005 (9th Cir. 2006) ("Clearly, NEPA and the ESA involve different standards,
    but this does not require USFS to disregard the findings made by FWS in connection with
27  formal consultation mandated by the ESA.").
28      [8]Depredation "means the confirmed killing or wounding of lawfully present
    domestic animals by one or more Mexican [W]olves."  50 C.F.R. § 17.84(k)(3).

implies there was no established wolf territory on an allotment within the Project area and no significant wolf depredation issue.  Plaintiffs do not dispute the Mexican Wolves lacked an established territory on an allotment and lacked a critical habitat due to their non-essential status under the ESA.  The consultations with FWS support the finding that none of the Project's allotments contained Mexican Wolf packs, territories, or rendezvous sites[9] at the time of Project approval.  (AR at 19629–30 (Alma Allotment); AR19677–78 (Citizen Allotment); AR19747–48 (Dry Creek Allotment); AR at 19787–88 (Holt Gulch Allotment); AR at 19851–52 (Pleasanton Allotment); AR at 19897–98 (Potholes Allotment); AR at 19915–16 (Sacaton Allotment); AR at 19959–60 (Keller Canyon Allotment); AR at 20177–78 (Alma Mesa Allotment); AR at 20274–75 (Copperas Allotment); AR at 20299–301 (Lop Ear Allotment); AR at 20883–85 (Blackjack and Hickey Allotments and portions of the Pleasant Valley Allotment added to Blackjack and Hickey).)

The data analyzed by the Forest Service shows only one of the fourteen allotments (Alma Mesa) lies within the "occupied range" of the Mexican Wolf (AR at 20177) and only that allotment has a confirmed livestock killing by wolves (AR at 20883).  Finally, the Project area only encompasses 3.5 percent of the approximately 7.7 million acres in Zone 1 (12,031.25 square miles) of the MWEPA.[10]  (AR at 12426 (Rule is codified at 50 C.F.R. § 17.84(k)); AR at 20921 (Project Area = 271,665 acres or 424.48 square miles).)  Plaintiffs do not dispute any of these facts.

_____

[9] Rendezvous site "means a gathering and activity area regularly used by Mexican Wolf pups after they have emerged from the den.  Typically, these sites are used for a period ranging from about 1 week to 1 month in the first summer after birth during the period from June 1 to September 30.  Several rendezvous sites may be used in succession within a single season."  50 C.F.R. § 17.84(k)(3).

[10] The parties agree Zone 1 is approximately 7.7 million acres.  *See* 50 C.F.R. § 17.84(k)(3) (Zone 1 "means an area in Arizona and New Mexico into which Mexican [W]olves will be allowed to naturally disperse and occupy and where Mexican [W]olves may be initially released from captivity or translocated.  Zone 1 includes all of the Apache, Gila, and Sitgreaves National Forests; the Payson, Pleasant Valley, and Tonto Basin Ranger Districts of the Tonto national Forest; and the Magdalena Ranger District of the Cibola National Forest.").  (Doc. 19 ¶ 53; Doc. 22 ¶ 53.)

1   The Court finds the administrative record supports the Forest Service's conclusion

2   that negative impacts on Mexican Wolves were minimal if the grazing alternative was

3   selected.  Therefore, Plaintiffs have not shown the Forest Service failed to take a "hard

4   look" at the likely impacts on Mexican Wolves.

5   ## 2.  Impact on Blue Range Primitive Area

6   Plaintiffs argue the EA is "arbitrary and capricious" because the Forest Service

7   failed to take a "hard look" at the Project's impacts on "important special management area

8   resources" (wilderness values and protected area characteristics) in the Blue Range

9   Primitive Area.[11]  (Doc. 16-1 at 13–16.)  Specifically, Plaintiffs contend the Forest Service

10  either "failed to analyze" the Project's impacts or failed to give the impacts "proper

11  weight."  (Id.)

12  Plaintiffs argue the Court cannot rely on the January 2019 Minimum Requirements

13  Analysis ("MRA") (AR at 19360–96) and the October 2018 Recreation and Special

14  Management Areas Report ("RASMAR") (AR at 20686–724) because the Forest Service's

15  "reasoning is not in the EA itself" and Plaintiffs were "never given the opportunity to

16  review and comment on these documents" because "neither the MRA nor any of the

17  agency's specialists' reports were made available to the public during NEPA's public

18  process" as required by 40 C.F.R. § 1500.1(b).  (Doc. 21 at 7.)  Plaintiffs also argue the

19  Forest Service's analysis is inadequate (i.e., fails to take a "hard look") because the Forest

20  Service incorrectly assumed:  (1) the Project's "proposed actions would be beneficial to

21

22  ⸻⸻⸻⸻

    [11]Plaintiffs also summarily argue the Project impacts "two designated wilderness

23  areas (the Blue Range Wilderness in Arizona and the Gila Wilderness in New Mexico)."
    (Doc. 16-1 at 13–16.)  The Forest Service argues no new improvements are proposed for

24  these areas and Plaintiffs have waived these arguments because they do not explain how
    these areas are impacted and the parties agreed in the Court's "Amended Case Management

25  Order" (Doc. 14 ¶ 3) that "[a]ny claims or defenses not raised during summary judgment
    briefing will be deemed to have been waived."  (Doc. 18-1 n.4.)  Plaintiffs do not attempt

26  to rebut this argument (Doc. 21 at 5–8).  Accordingly, the Court finds these arguments
    waived and will not address them.  The Court will also not address Plaintiffs' arguments

27  related to the "Greater Gila Bioregion" because Plaintiffs have not cited any law
    establishing how this region is entitled to any special protection.

28

- 13 -

enhancing the quality of the wilderness characteristics" because "livestock grazing is a necessary part of the wilderness experience" in the Blue Range Primitive Area; and (2) "livestock grazing, and the associated developments and motorized access as authorized in the decisions, is a required component of the area's management scheme." (Doc. 16-1 at 15.)  Plaintiffs also contend the Forest Service ignored that "the only need" for infrastructure developments is to address issues caused by allowing livestock grazing in the first place, so those developments could only be seen as beneficial if grazing continues. (Doc. 21 at 5–6.)

"A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain."  16 U.S.C. § 1131(c).  "Wilderness" is further defined as:

> an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

*Id.*  Wilderness areas are to be managed in a manner that preserves and protects their wilderness characteristics to leave them unimpaired for current and future use and enjoyment.  16 U.S.C. § 1131(a).

First, the Court addresses whether it is proper to consider the reports and analyses in the MRA and RASMAR.  While detailed reasoning of these two documents may not appear in the final EA, the final EA explicitly referred its readers to these documents.  (AR at 20936.)  This belies Plaintiffs' argument that they were "never given the opportunity to review and comment on these documents."  Furthermore, Plaintiffs do not explain how these documents were unavailable or claim they requested the documents and were denied

access to them.   Although the administrative record suggests Western Watersheds originally submitted a [Freedom of Information Act ("FOIA")] request on October 31, 2018, for "[a]ll specialist reports that are a part of the [Project] in the Apache-Sitgreaves and Gila National Forests," that request was clarified by Western Watersheds two days later via email.  (AR at 13884; AR at 14870.)  The email indicated Western Watersheds "was interested in the annual livestock allotment monitoring to assess use or utilization as well as the long-range monitoring of livestock allotments that help identify trends in use or ecological condition of the allotments."  (AR at 14870.)  The Forest Service produced responsive documents based on the clarification and Plaintiffs do not identify anywhere in the administrative record where they appealed that FOIA request despite the Forest Service's response indicating "[t]he FOIA provides you the right to appeal this response." (*Id.*)  Nor do Plaintiffs point to anywhere in the administrative record suggesting that after the FOIA response, they attempted to obtain reports and the Forest Service denied them access.  Accordingly, the Court finds no violation of § 1500.1(b) and will consider the information in those two documents.  *See* § 1500.1(b) (only requiring information to be made *available* to public officials and citizens before decisions are made or actions are taken).

Second, the Court addresses whether Plaintiffs have demonstrated the Forest Service's "ultimate conclusions are unreasonable" regarding the minimal effects the Project will have on the Blue Range Primitive Area if grazing and infrastructure developments are allowed.  *See Ctr. for Cmty. Action*, 18 F.4th at 599.  Here, the Project includes 33,495 out of 199,502 acres in the Blue Range Primitive area.  (AR at 21002.) The Blue Range Primitive area is not a congressionally designated wilderness area, but it is managed as wilderness due to a Forest Service plan.  (AR at 21002; AR at 19360 (MRA)).   The Project's proposed improvements in the Blue Range Primitive Area in Alternative 2 include "approximately 1.6 miles of new fence, 3 water storage tanks, 3 troughs, a solar panel, and 2.9 miles of pipeline."  (AR at 21002.)  The Project would also remove 1.3 miles of existing fence under Alternative 2.  (AR at 21002.)   Contrary to

Plaintiff's suggestion, nothing in the EA or the administrative record shows the Forest Service assumed it was required to authorize livestock grazing.  The Forest Service explicitly considered an alternative (Alternative 1) that would authorize no grazing and no infrastructure developments in the EA, and it acknowledged this no-grazing alternative would likely improve wilderness characteristics.  (AR at 21004.)  The Forest Service simply chose not to pursue that plan after concluding the grazing alternative would only have minimal effects to the Blue Range Primitive Area.  The Forest Service argues it was proper to do so because the Project's improvements would be implemented in a manner that would "enhance the values" and "provide a net benefit to the resources in the area" based on the conditions at the time of the Project.  (Doc. 18-1 at 12, 14.)  The Court agrees.

The EA discusses how many of the infrastructure developments in Alternative 2 would be implemented in a manner that would minimize environmental risks, protect resources, and more effectively manage these resources.  For example, the Project includes 0.8 miles of fencing in the northwest corner of the Alma Mesa Pasture to "prevent livestock from congregating near the confluence of Little Blue Creek and Yam Canyon, improving resource conditions and helping to protect an occupied Mexican spotted owl Protected Activity Center."  (AR at 20936; AR at 20705 (RASMAR).)  The "water developments in the Alma Mesa pasture would improve livestock distribution and, in turn, plant diversity, soil and watershed conditions and improved ecological processes which would improve the natural qualities."  (AR at 21008.)  The solar panel "would mitigate the intrusive sounds of the authorized diesel generator at Stateline Cabin well, which would add to the feeling of solitude in that area."  (AR at 21007.)  Notably, the proposed improvements represented the least impactful of three alternatives analyzed in the MRA.  (AR at 19362–63, 69–88.)  This information suggests the Forest Service knew and considered the grazing alternative would have some environmental effects on the Blue Range Primitive Area,[12] but found

---

[12]These effects include, among other things, a decreased "feeling of solitude," "feeling of modification or manipulation versus being unbound or unhampered" due to range improvements, and "intrusive sounds of the authorized diesel generator."  (AR at 21004–07.)

those effects would be minimal.  *See Robertson*, 490 U.S. at 350 ("NEPA merely prohibits uninformed—rather than unwise—agency action.").  The EA also notes: "constructing the proposed 0.8-mile fence in the northwest corner of Alma Mesa, would allow approximately 1.3 miles of existing fence in Yam Canyon and Little Blue Creek to be removed." (AR at 21006.)  Removing fencing would be a positive impact on the area.

The Court finds the administrative record supports the Forest Service's conclusion that negative impacts to the Blue Range Primitive Area would be minimal if the grazing alternative was selected.  Therefore, Plaintiffs have not shown the Forest Service failed to take a "hard look" at the likely impacts upon the Blue Range Primitive Area.

### 3.  Impact on Inventoried Roadless Areas

Plaintiffs argue the EA is arbitrary and capricious because the Forest Service failed to take a "hard look" at the Project's effects on inventoried roadless areas.  (Doc. 16-1 at 15.)  According to Plaintiffs, the Forest Service needed to analyze the "effects of the extensive infrastructure developments slated for these unique, remote, wild and roadless landscapes" to comply with NEPA.  (*Id.* at 16.)  Plaintiffs argue the Forest Service failed to do this and instead relied on a generalized conclusory statement that no analysis was needed because "no new roads will be developed in inventoried roadless areas." (*Id.*)

The 2001 Roadless Area Conservation Rule ("Roadless Rule"), 66 Fed. Reg. 3244 (Jan. 12, 2001), was promulgated to provide lasting protection for roadless areas.  *Los Padres ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649, 655–56 (9th Cir. 2022).   An "Inventoried Roadless Area" ("IRA") is an area providing "large, relatively undisturbed landscapes that are important to biological diversity and the long-term survival of many at risk species."  Special Areas; Roadless Area Conservation, 66 Fed. Reg. 3244, 3245 (Jan. 12, 2001); *see also* 36 C.F.R. § 294.11.  Absent certain exceptions, the Roadless Rule "prohibits road construction [and] reconstruction . . . in [IRAs] because they have the greatest likelihood of altering and fragmenting landscapes, resulting in immediate, long-term loss of roadless area values and characteristics." *See* 66 Fed. Reg. 3244, 3272 (Jan. 12, 2001).

Here, approximately 79,990 acres of IRAs are within the Project area.  (AR at 21002.)  Alternative 2 of the Project permits the following infrastructure developments on some of these IRAs:  the installation of approximately 10 miles of fence, 11 miles of water pipeline, 1 well, 1 trick tank, 2 corrals, 9 water storage tanks, and 14 water troughs.  (AR at 21007.)  It is undisputed no new roads are being constructed or reconstructed within an IRA. (AR at 21007.)  Therefore, the Roadless Rule does not apply.  Nonetheless, the Forest Service still analyzed the nine roadless characteristics, even though it was not required to, and concluded the Project will not have significant impacts on the IRAs.[13]  (AR at 20707–08.)  This belies Plaintiffs' argument that the Forest Service only relied on a generalized conclusory statement.

Further, the Forest Service summarized the Project's effects on:  (1) soil, water, and air resources; (2) sources of public drinking water; (3) diversity of plant and animal communities; (4) habitat for threatened or endangered species and species dependent on undisturbed areas of land; (5) primitive and semiprimitive classes of recreation; (6) reference landscapes for research study or interpretation; (7) landscape character and integrity; (8) traditional cultural properties and sacred sites; and (9) other locally unique characteristics.  (AR at 23149–51.)  Plaintiffs do not dispute any of this analysis.

Therefore, the administrative record supports the Forest Service's conclusion that negative impacts to the IRAs were minimal if the grazing alternative was selected.  Thus, the Court concludes Plaintiffs have not shown the Forest Service failed to take a "hard look" at the likely impacts on the IRAs.

### 4.  Summary

In sum, Plaintiffs have not shown the Forest Service violated the APA by failing to take a "hard look" at the Project's impacts on the Mexican Wolves, the Blue Range Primitive Area, or IRAs.

. . . .

---

[13]Although these nine roadless characteristics were not discussed in the original Final EA, the Forest Service issued a notice of errata adding this analysis.  (AR at 23149–51.)  Plaintiffs do not challenge the Forest Service's reliance on the notice of errata.

1

   **B.  <u>Failure to Prepare an EIS</u>**

2       Plaintiffs argue the Forest Service's decision to authorize the Project without

3  preparing an EIS is "arbitrary and violates NEPA because the . . . Project may result in

4  significant impacts upon the human environment" and substantial questions exist regarding

5  those impacts.  (Doc. 16-1 at 8, 16–24; Doc. 21 at 8.)  Specifically, Plaintiffs argue the

6  context of the Project is "massive" and there are several intensity factors warranting an

7  EIS, including the effects on certain endangered species, the unique characteristics of the

8  area, public safety concerns, and significant cumulative impacts.  (Doc. 16-1 at 18–25;

9  Doc. 21 at 8–14.)

10      When an agency prepares an EA and subsequently determines an EIS is not

11  required, as the Forest Service did here, it must "issue a [FONSI], briefly describing why

12  the action 'will not have a significant effect on the human environment.'"  *In Def. of*

13  *Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) (quoting 40 C.F.R.

14  § 1508.13).  In this Circuit, an EIS is required if there are "'*substantial questions* whether

15  a project may have a significant effect' on the environment."  *Anderson v. Evans*, 314 F.3d

16  1006, 1017 (9th Cir. 2002) (quoting *Blue Mountains Biodiversity Project v. Blackwood*,

17  161 F.3d 1208, 1212 (9th Cir. 1998)).

18      Agencies must consider the context and intensity of a proposed action to determine

19  whether there will be significant environmental impacts.  40 C.F.R. § 1508.27.  The

20  significance of a proposed action "must be analyzed in several contexts such as society as

21  a whole (human, national), the affected region, the affected interests, and the locality"; both

22  the "short- and long-term effects are relevant."  40 C.F.R. § 1508.27(a).  Intensity "refers

23  to the severity of impact" and the following factors, among others, "should be considered":

24  "The degree to which the action may adversely affect an endangered or threatened species

25  or its habitat that has been determined to be critical under the Endangered Species Act of

26  1973"; "Unique characteristics of the geographic area such as proximity to historic or

27  cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or

28  ecologically critical areas"; "The degree to which the proposed action affects public health

or safety"; and "Whether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b).  The presence of even "one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).

When reviewing an agency's decision not to prepare an EIS under NEPA, the Court must "determine whether the agency has taken a 'hard look' at the consequences of its actions, based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant.'" *In Def. of Animals*, 751 F.3d at 1068.  The agency cannot rely on "conclusory assertions that an activity will have only an insignificant impact on the environment" to avoid preparing an EIS.  *Ocean Advocs.*, 402 F.3d at 864.

### 1.  Context of Project

Here, the Forest Service considered the context of the Project and concluded authorizing the grazing alternative would "not have a significant effect on the quality of the human environment" after reviewing the information in the EA "and the documentation included in the [P]roject record."  (AR at 23163–64; AR at 23185; AR at 23256.)  In the FONSIs issued for the Project, the Forest Service reasoned:  "This [P]roject is a site-specific action that does not have international, national, regionwide, or statewide importance and will not affect regional or national resources.  This decision is made within the context of local importance in the project area along the Arizona-New Mexico state line." (AR at 23164.)

Specifically, the Project considered authorizing ten years of livestock grazing on fourteen allotments of land; including 271,665 acres across two states and multiple national forests.  (AR at 20921; AR at 11616.)  "Permitted numbers vary from 3,791 to 4,022 head of cattle and horses, depending on the time of year, for a total of 45,462 animal unit months currently permitted through term grazing permits or authorized per decision notices on these allotments."  (AR at 20921.)

While this is a large Project—spanning across two states and multiple national forests—Plaintiffs do not point to, and the Court is unaware of, any authority holding large projects necessarily have a significant environmental impact.  Indeed, case law suggests otherwise.  *See WildEarth Guardians v. Conner*, 920 F.3d 1245, 1262 (10th Cir. 2019) ("[T]here is no categorical rule that sizable federal undertakings *always* have a significant effect on the quality of the human environment." (quoting *TOMAC v. Norton*, 433 F.3d 852, 862 (D.C. Cir. 2006))); *Decker v. U.S. Forest Serv.*, 780 F. Supp. 2d 1170, 1179 (D. Colo. 2011) ("Even assuming that the project does impact a relatively large area, plaintiffs have not provided any support for the contention that an EIS is necessary when a project reaches a certain size.").  Therefore, the Court concludes this factor alone does not show substantial questions exist as to whether the Project may have significant effects.

### 2.   Intensity of the Project

#### i.   Adverse Effect on Endangered or Threated Species

An agency should consider "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973."  40 C.F.R. § 1508.27(b)(9).

Plaintiffs argue substantial questions exist as to whether the Project may adversely affect the Mexican Wolf and the Forest Service failed to include a "convincing statement of reasons" as to why no significant adverse impacts may occur.  (Doc. 16-1 at 19; Doc. 21 at 9–11.)  Plaintiffs repeat their arguments that it was improper for the Forest Service to rely on ESA consultations because the ESA and NEPA standards are different, and the Forest Service incorrectly believed the Mexican Wolf was exempt from NEPA analysis based on its ESA status.  (Doc. 16-1 at 19–20; Doc. 21 at 9.)

The Court finds Plaintiffs have not shown substantial questions exist as to whether the Project may have significant adverse effects on the Mexican wolves.  The Forest Service addressed this intensity factor in the three FONSIs it issued and concluded there would not be significant effects based on the information in the EA.  (AR at 23160–61, 68 (Alma, Citizen, Dry Creek, Holt Gulch, Pleasanton, Potholes, & Sacaton); AR at 23181–

82, 90 (Alma Mesa, Copperas, Keller Canyon, & Lop Ear); AR at 23252–53, 61 (Blackjack, Hickey, Pleasant Valley).)   For the reasons explained in Section IV(A)(1) above, the administrative record shows the Forest Service adequately considered the potential adverse impacts of the Project on Mexican Wolves and reasonably found them to be minimal.

Plaintiffs also contend the Forest Service failed to properly consider the adverse effects on ten other species[14] by solely relying on a generalized conclusory statement—"may affect, not likely to adversely affect"—for each of the species in some of the Project allotments.  (Doc. 16-1 at 19–20.)  The administrative record suggests the Forest Service did not rely on this statement alone.  The Forest Service consulted with FWS for each allotment and considered proposed utilization levels and management plans for each allotment including:  pasture rests, grazing duration, timing and frequency; proposed range improvements and developments; vegetation conditions and trends and forage availability; watershed conditions and trends; suitable habitat; and habitat needs for each specific listed species.  (*See* AR at 20974–86.)  The Court finds Plaintiffs have not shown substantial questions exist as to whether the Project may have significant adverse effects on these ten species.  Thus, Plaintiffs have not shown this intensity factor requires an EIS.

ii.   Unique Characteristics of Area

An agency must consider the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas."  40 C.F.R. § 1508.27(b)(3).

Plaintiffs argue substantial questions exist as to whether there may be significant environmental effects on the unique characteristics of this area because the Project would authorize "grazing and infrastructure developments in or near areas with 'unique characteristics.'"  (Doc. 16-1 at 20–22; Doc. 21 at 11.)  Specifically, Plaintiffs argue the

---

[14]These ten species are the "Southwest willow flycatchers, Gila chub, Loach minnows, Spikedace, Mexican spotted owls, Western yellow-billed cuckoos, Chiricahua leopard frogs, northern Mexican gartersnakes, narrow-headed gartersnakes, and Gila trout, all of which are listed as endangered or threatened under the ESA."  (Doc. 16-1 at 20.)

Project area is unique because it includes "[o]ver 21,589 acres" of two federally designated Wilderness areas, 33,495 acres of the Blue Range Primitive Area, 79,990 acres of IRAs, "three stretches of rivers that have been deemed eligible for inclusion in the National Wild and Scenic Rivers system," and six river stretches designated as Outstanding National Resource Waters.  (Doc. 16-1 at 21–22.)  Plaintiffs argue the EA fails to mention the Project occurs "within the heart of Management Zone 1 of the Mexican Wolf Recovery Area," which, Plaintiffs assert, is an ecologically critical area containing "some of the most suitable habitable for Mexican [W]olf recovery in the American Southwest."  (Doc. 16-1 at 21–22; Doc. 21 at 11.)   Plaintiffs also argue all allotments affected by the Project "contain significant cultural resources."  (Doc. 16-1 at 22.)  Plaintiffs further assert the EA "includes only generalized conclusory statements that effects are not significant or will be effectively mitigated" and the Forest Service failed to provide a convincing statement of reasons in the EA or FONSIs as to why the Project's impacts on these "unique characteristics" are insignificant.  (Doc. 21 at 12–13.)

The Court finds Plaintiffs have not shown substantial questions exist as to whether the Project may have significant environmental impacts on the Project area's "unique characteristics."  The Forest Service addressed this intensity factor in the three FONSIs it issued and concluded there would not be significant environmental effects based on the information in the EA.  (AR at 23252–53, 57–58 (Blackjack, Hickey, Pleasant Valley); AR at 23160–61, 65 (Alma, Citizen, Dry Creek, Holt Gulch, Pleasanton, Potholes, & Sacaton); AR at 23181–82, 86 (Alma Mesa, Copperas, Keller Canyon, & Lop Ear).)   The Forest Service analyzed the effects to the two federally designated Wilderness areas, the Blue Range Primitive Area, and the rivers mentioned above in each allotment of land implicated. Assuming without deciding Zone 1 is an ecologically critical area that can be analyzed under this intensity factor, the Project only affects up to 3.5 percent of Zone 1.

The Forest Service discussed cultural resources in the Project's area and explained different mitigation measures it would take to preserve cultural resources in the three FONSIs.  (AR at 23167–68; AR at 23189–90, AR at 23260–61.)  These FONSIs indicated

1    Alternative 2 would have no significant adverse effects to cultural resources and this
2    information was also in the EA.  (AR at 20996–97.)  Plaintiffs do not meaningfully explain
3    how the Forest Service's reasoning on this issue is insufficient.  Thus, Plaintiffs have not
4    shown this intensity factor requires an EIS.

5              iii.    Public Health and Safety Concerns

6         An agency must consider "[t]he degree to which the proposed action affects public
7    health or safety."  40 C.F.R. § 1508.27(b)(2).

8         Plaintiffs argue substantial questions exist as to whether the Project "may present
9    impacts affecting public health and safety" as a result of "*E. coli* contamination of water
10   resources in the [P]roject area."[15]  (Doc. 16-1 at 22–24; Doc. 21 at 13.)  Plaintiffs assert the
11   Forest Service "fail[ed] entirely to explain or analyze" this factor because it failed to
12   address Plaintiffs' concerns that the grazing alternative "will continue to exacerbate already
13   impaired water quality in the [P]roject area" due to degradation caused by livestock
14   trampling and defecation, increased allowance of withdrawals via new pipelines and wells,
15   and "the documented concern regarding trespass livestock breaching . . . exclosures."
16   (Doc. 16-1 at 22–23; Doc. 21 at 13.)  Plaintiffs express particular concern over six riparian
17   reaches at risk of contamination (AR at 20963) and four waterbodies in the Project area,
18   which are considered impaired waterbodies under Section 303(d) of the Clean Water Act
19   (AR at 20964).[16]  (Doc. 16-1 at 23.)

20        The Court finds Plaintiffs have not shown substantial questions exist as to whether
21   the Project may have significant adverse effects on public health or safety based on *E. coli*
22   contamination.  The Forest Service addressed this intensity factor in the three FONSIs it
23   issued and concluded there would not be significant environmental effects based on the
24   information in the EA.  (AR at 23252–53, 23257–58 (Blackjack, Hickey, Pleasant Valley);

---

25        [15]"*E. coli* is a bacteria used as an indicator of contamination and health risk . . . .
26   Fecal matter may introduce *E. coli* and pathogens making people, wildlife and livestock
     potential sources of pollution."  (AR at 6116.)
27        [16]"Under Section 303(d)(1) of the Clean Water Act, states are required to develop a
28   list of waters within a state that are not in compliance with water quality standards and to
     establish a total maximum daily load (TMDL) for each pollutant."  (AR at 21057.)

1    AR at 23160–61, 23165 (Alma, Citizen, Dry Creek, Holt Gulch, Pleasanton, Potholes, &

2    Sacaton); AR at 23181–82, 23186 (Alma Mesa, Copperas, Keller Canyon, & Lop Ear).)

3           The Forest Service also addressed this factor in the EA.  There, The Forest Service

4    acknowledged the no-grazing alternative would improve water quality due to no grazing.

5    (AR at 20972.)   However, it also concluded the grazing alternative would only have

6    insignificant impacts because it would only have "[l]ocalized, short-term effects to water

7    quality" and this alternative would be implemented in an adaptive manner that would

8    maintain or improve water quality levels.  (*Id.*)

9           The Forest Service acknowledged grazing has contributed to water impairment in

10    the past and two segments of the Blue River and San Francisco River are listed as impaired

11    waterbodies under Section 303(d) due to *E.coli* contamination.  (AR at 20963–64.)   It

12    addressed *E. coli* concerns and explained how the Project's features would maintain or help

13    to improve water quality in impaired areas in relation to *E. coli* if the grazing alternative

14    was selected.  Specifically, the EA indicated the Project would continue to limit access to

15    the San Francisco River, better distribute livestock in uplands, and keep a conservative

16    utilization rate to help improve water quality.  (AR at 20969.)  The EA also references the

17    Watershed Report (AR at 20962), which acknowledged livestock grazing is a concern, but

18    the greatest cause of concern regarding *E. coli* in the Blue and San Francisco Rivers is

19    unmanaged recreation.[17]  (AR at 21057.)

20           Having reviewed the record, the Court concludes Plaintiffs have not shown a

21    substantial question exists as to whether the Project may have a significant effect on public

22    health or safety.  The EA already appears to address the questions raised by Plaintiffs'

23    water quality concerns and this analysis supports the Forest Service's conclusion the effects

24    are insignificant.  First, Plaintiffs seem to overstate the poor quality of water in the area

25

26           [17]Once again, Plaintiffs argue the Watershed Report should not be considered
      because it "was never made available to the public contrary to" 40 C.F.R. § 1500.1(b).
27    (Doc. 21 at 13; Doc. 23 at 14, n.5.)  Again, the Watershed Report was mentioned in the
      Preliminary EA and Final EA and Plaintiffs could have obtained the Report if they had
28    requested it.  (AR at 13627 (Preliminary EA); AR at 20962 (Final EA).)

caused by past livestock grazing.  The EA indicates 43 out of the 51 riparian areas are functioning properly, 8 are at risk, and no areas were rated as impaired.  (AR at 20963.)  Although not perfect, the public health and safety concern here does not appear to be significant.  Second, contrary to Plaintiffs' suggestion, the EA makes clear the Project would lead to a "3 percent decrease in [the] total permitted" AUMs, which would result in a slight decrease in the amount of water consumed by livestock annually.  (AR at 20968; AR at 21013.)  Third, the EA acknowledged livestock trespass may occur because "no exclosure or fence is 100 percent effective," but the Forest Service indicated it planned to monitor the presence of livestock and would address breaches as needed.  (AR at 20935.)  Thus, Plaintiffs have not shown this intensity factor requires an EIS.

iv.   Cumulatively Significant Impacts

An agency should consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts.  Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment.  Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts."  40 C.F.R. § 1508.27(b)(7).  "Cumulative impact" is also defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions" and "can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7.

Plaintiffs argue "[a] substantial question exists whether the [] Project will have significant cumulative impacts" on the "Mexican [W]olves, Mexican [W]olf recovery, and the ecosystems in which Mexican [W]olves live."  (Doc. 16-1 at 24; Doc. 21 at 13.)  Plaintiffs repeat their argument the Forest Service failed to consider the magnitude of the "potentially detrimental impacts" of the grazing, "especially considering that grazing has already been ongoing for more than a century."  (Doc. 21 at 13–14 (internal quotation marks and citation omitted).)  The Court disagrees.

The Forest Service addressed this intensity factor in the three FONSIs it issued and

- 26 -

concluded there would not be significant environmental effects based on the information in the EA.  (AR at 23252–53, 23260 (Blackjack, Hickey, Pleasant Valley); AR at 23160–61, 23167 (Alma, Citizen, Dry Creek, Holt Gulch, Pleasanton, Potholes, & Sacaton); AR at 23181–82, 23188 (Alma Mesa, Copperas, Keller Canyon, & Lop Ear).)   The Forest Service explained:

> The direct and indirect effects of the selected alternative are expected to be minor in the short term and beneficial or neutral over the long term.  None of the effects are considered significant for reasons described herein.  No past or future actions have been identified that will combine with the effects of the selected alternative to cause cumulatively significant effects.

(AR at 23260, 23167, 23188.)  The Forest Service also addressed this factor in more detail in the EA as described in section IV(A)(1).  Having reviewed the record, the Court concludes Plaintiffs have not shown a substantial question exists as to whether the Project may have significant cumulative environmental impacts on Mexican Wolves.  Although the Mexican Wolf may be in "grave shape" as Plaintiffs state (Doc. 16-1 at 24), Plaintiffs have not shown an EIS is necessary due to cumulative impacts based on this Project.

### 3.  Summary

In sum, Plaintiffs have not shown the Forest Service's decision to not prepare an EIS was "arbitrary and capricious" because Plaintiffs failed to show there are substantial questions as to whether the Project may have a significant effect on the environment based on the context and intensity factors.

### C.  **Range of Alternatives**

Plaintiffs argue the Forest Service's "failure to consider numerous reasonable alternatives renders the EA 'inadequate' and is arbitrary, capricious, and not in accordance with law."  (Doc. 16-1 at 25–27 (internal citations omitted).)  According to Plaintiffs, the Forest Service ignored "requests for multiple different alternatives to be considered" and "failed to explain why the varying reduced grazing options as proposed by commenters were not considered here" even though they were "all viable alternatives that meet the purpose and objectives of the [P]roject."  (*Id.* at 26–27.)  Plaintiffs argue that by only

considering the two alternatives it did, the Forest Service failed to properly "consider the importance of the suggested alternatives for allowing management flexibility in the [] Project's grazing management scheme" and relegated "environmental considerations to secondary status." (Doc. 21 at 14–15 (internal citation omitted).)

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). "Although an agency must still 'give full and meaningful consideration to all reasonable alternatives' in an [EA], the agency's obligation to discuss alternatives is less than in an EIS." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (quoting *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008)).

"The range of alternatives that an agency must consider under NEPA is based on the purpose and need of the proposed agency action," *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 981 (9th Cir. 2022), and the agency is only required to consider alternatives "reasonably related to the purposes of the project," *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (internal quotation marks and citation omitted). The focus of the reasonable alternatives analysis is on the "substance of the alternatives" rather than "the sheer number of alternatives considered" because there is no minimum number of alternatives an agency must consider. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005). "An agency need not [] discuss alternatives similar to alternatives actually considered, or alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Engrs.,* 524 F.3d 938, 955 (9th Cir. 2008) (internal quotation marks and citation omitted). However, "[t]he existence of a viable but unexamined alternative renders an [EA] inadequate." *Abbey*, 719 F.3d at 1050 (quoting *Westlands*, 376 F.3d at 868). In rejecting any alternatives, the agency must only "briefly discuss the reasons" why alternatives "were eliminated from detailed study." 40 C.F.R. § 1502.14; *see also Native Ecosystems*, 428

F.3d at 1245 (applying § 1502.14 to EA analysis).  The Court will address the arguments related to the range of alternatives in the context of the highly deferential APA standard.  *See N.W. Ecosystem All.*, 475 F.3d at 1140.

Here, the EA only analyzed two alternatives: a no-grazing alternative and the grazing alternative.  (AR at 20927–28.)   Throughout the NEPA process (i.e., scoping period, Preliminary EA, Final EA, FONSIs), members of the public proposed different alternatives the Forest Service could consider, but the Forest Service found it appropriate to only consider two alternatives in detail.  (AR at 11619–20 (Scoping); AR at 13586, 13596 (Preliminary EA); AR at 20917, 20927–28 (Final EA).)

Plaintiffs cite comments made by Western Watersheds during the scoping period and argue the Forest Service failed to consider its requests for "alternatives that considered environmental impacts on an allotment-by-allotment basis instead of the proposed all-or-nothing approach" and "an alternative that considered maintaining the Pleasant Valley allotment as vacant, and not merely transitioning allowed numbers to neighboring allotments."  (Doc. 16-1 at 26 (citing AR at 11864, 14740).)   In response to these comments, the Forest Service explained, "The comment does not identify a specific issue.  However, for each allotment or relevant portion thereof, this analysis will assess whether livestock grazing is compatible with desired conditions and objectives or if it would result in substantial and permanent impairment of the resources."  (AR at 12214.)  When the issue was raised again by Western Watershed in a comment to the Preliminary EA, the Forest Service responded it found no additional alternatives were needed because the "current analysis" in the Preliminary EA addressed these issues because "[t]he no action alternative [] consider[ed] removing cattle from the allotments and the deciding official has discretion to decide from among components of the two alternatives analyzed including by allotment."  (AR at 21350, 21409–10.)  That is, the Forest Service indicated it did not need to consider these proposed alternatives because they were already addressed or similar enough to the two alternatives analyzed in the EA.  The Court finds these explanations adequate to explain why Plaintiffs' proposed alternatives were not explored in further

1    detail.

2          Next, Plaintiffs cite an objection from WildEarth Guardians which argued the

3    following proposed alternatives were not considered:  (1) an alternative "with no grazing

4    in wilderness areas"; (2) an alternative specifically addressing wolf/livestock conflicts.

5    (Doc. 16-1 at 26 (citing AR at 23066–67).)  The Forest Service addressed this objection

6    and explained "the draft Decision Notice provides a range of actions from which the

7    responsible officials can choose components from implementing all activities analyzed to

8    something less." (AR at 23116–17.)  The Forest Service also addressed these two proposed

9    alternatives when it responded to comments to the Preliminary EA and explained these are

10   addressed by the "current analysis."  (AR at 21428–33 (wilderness); AR at 21441–45

11   (wolves).)  Because the grazing alternative in the EA addressed wolf/livestock conflicts

12   and the no-grazing alternative in the EA addressed no grazing in wilderness areas, the Court

13   finds these brief explanations adequate to explain why these alternatives were not explored

14   in further detail.

15          Lastly, Plaintiffs argue the Forest Service ignored an alternative proposed by the

16   Center for Biological Diversity, which would have:  (1) "reduced stocking levels"; (2)

17   shortened grazing season durations (i.e. "less than a year"); (3) decreased allowable

18   utilization levels; (4) added periods of pasture rest; (5) full riparian area exclusion; and (6)

19   no new construction of water developments or fencing.  (Doc. 16-1 at 26 (citing AR at

20   23044–45 (objection to Final EA and FONSIs)); *see also* AR at 11887 (scoping comment).)

21   In response to this objection, the Forest Service explained an earlier document described

22   "changes [from the scoping notice to the Preliminary EA] resulting from public

23   involvement and internal discussions such as shortening the duration of use in some

24   pastures, decreasing utilization levels on 9 allotments, eliminating grazing from additional

25   riparian areas, and modifying the proposed range improvements." (AR at 23126–28 (citing

26   AR at 12620–22).)  The Forest Service also explained the grazing alternative "responds to

27   the issues," the no-grazing alternative "considers removing cattlemen from the allotments,"

28   and "[t]he deciding official can choose from among the components of the two alternatives

analyzed, including choosing individual components for different allotments." (AR at 23127.) The administrative record indicates the alternatives proposed by the Center for Biological Diversity were considered but not addressed in detail because the proposed alternatives had already been addressed by or were similar enough to the two alternatives considered.

The Forest Service is not required to consider a specific number of alternatives and courts have upheld agency decisions where the agency only considered two alternatives in an EA. *See*, *e.g.*, *Native Ecosystems*, 428 F.3d at 1246 ("The statutory and regulatory requirements that an agency must consider 'appropriate' and 'reasonable' alternatives do[] not dictate the minimum number of alternatives that an agency must consider."); *Bark v. U.S. Forest Serv.*, 393 F.Supp.3d 1043, 1060 (D. Or. 2019), *rev'd on other grounds*, 958 F.3d 865 (9th Cir. 2020) ("There is no numerical floor on alternatives to be considered, and it is usually sufficient to consider only the preferred and no action alternatives" in an EA (internal quotation marks and citation omitted)); *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1146–47 (9th Cir. 2000) (EA considered "reasonable range of alternatives given the objectives of the Project").

Given the Project's objectives of providing "long-term management direction on grazing" and maintaining or improving the Project area resource conditions, the two alternatives considered in the EA were a reasonable range of alternatives. (AR at 20924.) While the Forest Service only examined two alternatives to the dismay of Plaintiffs, it considered other proposed alternatives and discussed why it deemed it unnecessary to address those proposed alternatives in detail. That is all NEPA requires when rejecting alternatives—NEPA does not require the Forest Service to scale back its Project in favor of an arguably more environment-friendly alternative that Plaintiffs would prefer. *See Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 184 (4th Cir. 2005) ("NEPA is a procedural statute; it does not force an agency to reach substantive, environment-friendly outcomes."). Therefore, the Court concludes Plaintiffs have not shown the Forest Service violated the APA or NEPA by only considering the two alternatives analyzed in its EA.

The Forest Service's consideration of two alternatives was reasonable and the range of alternatives considered achieved the goals intended by NEPA: open, thorough public discussion promoting informed decision-making.  *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 872 (9th Cir. 2004).

## V.   CONCLUSION

For the reasons above, Plaintiffs have not shown the Forest Service's decision was arbitrary, capricious, or not in accordance with law.  *See* 5 U.S.C. § 706(2)(A).  The administrative record shows the Forest Service considered data and public input and decided to reauthorize livestock grazing on these allotments of land based on the appropriate factors.  *See Earth Island Inst. v. Muldoon*, -- F.4th --, 2023 WL 5921619 at *10 (9th Cir. 2023) ("Once the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference.").  In particular, the Court finds the lengthy 102-page Final EA (AR at 20921–21022) coupled with its reference in three FONSIs of approximately 20 pages each (AR at 23152–70; AR at 23172–92; AR at 23242–63) more than sufficient to meet the "concise public document" standard to briefly provide sufficient evidence and analysis for determining whether to prepare an EIS.  *See* 40 C.F.R. § 1508.9(a)(1).  This belies Plaintiffs' suggestions throughout the pleadings the Forest Service relied on generalized conclusory statements and arbitrarily rubber stamped this Project without much thought.  Because Plaintiffs have not met their burden of demonstrating the Forest Service's "ultimate conclusions are unreasonable," *Ctr. for Cmty. Action*, 18 F.4th at 599, the Court must uphold the Forest Service's decision.  *See Pac. Coast Fed'n of Fishermen's Ass'n, Inc.*, 265 F.3d at 1034.

Accordingly,

**IT IS ORDERED** Plaintiffs' Motion for Summary Judgment (Doc. 16) is **DENIED**.

**IT IS FURTHER ORDERED** Forest Service's Cross Motion for Summary Judgment (Doc. 18) is **GRANTED**.

. . . .

**IT IS FURTHER ORDERED** the Clerk of the Court shall enter judgment in favor of Defendants, docket accordingly, and close this action.

Dated this 29th day of September, 2023.

Honorable Scott H. Rash
United States District Judge